**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| United States of America, ) | |
| Plaintiff, ) | |
| ) | Case No. 09-cr-332-10 |
| v. ) | |
| ) | Judge Joan B. Gottschall |
| Jorge Lopez, ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Jorge Lopez moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) based on his medical conditions, which include surgical-onset heart conditions (tachycardia and atrial fibrillation), surgical follow-up care directed by Lopez's doctors, and anxiety disorder for which he is still on medication. *See* ECF No. 2013 at 1–2. Evidence, described below, makes clear that Lopez is unable effectively to care for these medical needs in the prison setting. In accordance with a plea agreement, Lopez received a 15-year sentence, far below the advisory guidelines range, due to his extensive cooperation and substantial assistance to the government. The Bureau of Prisons ("BOP") projects that he will be released on June 4, 2025, meaning that he has served approximately 80% of his expected sentence.[1]

**Background**

The 13-count third superseding indictment charged 11 defendants in a wide-ranging drug-trafficking and racketeering operation masterminded by Saul Rodriguez. *See generally* Third Superseding Indictment, ECF No. 274. Prior opinions have discussed the facts and charges in depth, and those summaries need not be repeated. *See, e.g.*, *United States v. Cardena*, 842 F.3d 959, 971–72 (7th Cir. 2016); *United States v. Sparkman*, 973 F.3d 771, 772–73 (7th Cir. 2020). Lopez was charged in counts 12 and 13. Third Superseding Indictment 33–38; Plea Agmt. 1–2, ECF No. 1282-1. In his plea agreement, Lopez admitted, *inter alia*, that he purchased wholesale

---

1  BOP, *Find an Inmate*, https://www.bop.gov/mobile/find_inmate/byname.jsp#inmate_results (last visited Feb. 13, 2023).

quantities of cocaine from Rodriguez beginning in 2001, that in the same year he paid Rodriguez to arrange to kill a person he believed was responsible for his brother's murder, that he was involved in planning the kidnapping of a drug dealer in 2004 (Lopez did not personally participate in the kidnapping), and that he was involved in planning an attempted kidnapping in 2008. *See* Plea Agmt. 2–17.

Soon after his 2009 arrest, Lopez began assisting the government. Lopez not only provided testimony before a grand jury and at trial against several co-defendants but also helped the government in other matters. *See* Sent. Tr. 5, 7, ECF No. 2013-1; Mot. Compassionate Release 3, 4, ECF No. 2013; Resp. to Mot. Compassionate Release 4, ECF No. 2021. While he was cooperating, Lopez spent over four years in home detention, essentially house arrest, as a condition of pretrial release. Mot. Compassionate Release 5; ECF No. 65; ECF No. 99. No problems were reported. At sentencing, the court recommended to the BOP that those four years be credited toward Lopez's sentence. Sent. Tr. 11. (The BOP declined that recommendation. Mot. Compassionate Release 5.) Lopez ultimately pleaded guilty to count 13 charging him with possessing five kilograms or more of cocaine and one kilogram or more of heroin with intent to distribute. *See* Plea Agmt. 2; Third Superseding Indictment 34. This offense carried a 10-year mandatory minimum. *See* 21 U.S.C. § 841(a)(1)(A), 846 (2009).

The extent and value of Lopez's cooperation are reflected in the extent of the downward departure the government requested at his 2013 sentencing. Under the presentence investigation report ("PSR"), ECF No. 1382, which the court adopted without objection, Sent. Tr. 4, Lopez received no adjustment for his role in the offense, making him an average participant in Rodriguez's operation. *See* PSR 10–11. Lopez had a criminal history score of zero. PSR 15. Even so, the advisory sentencing guidelines recommended a life sentence. PSR 31. However, Lopez's substantial assistance prompted the government to move for a downward departure and

2

recommend a 15-year sentence. *See* U.S.S.G. § 5K1.1; 18 U.S.C. § 3553(e); Addendum to Plea Agmt. ¶ 16, Sept. 10, 2013, ECF No. 1399. The prosecutor stated:

> [I]t's the Government's view that this sentence of 180 months does strike a balance between the extremely serious nature of the offense as well as the significant cooperation provided by Mr. Lopez. It also takes into account the 3553(a) factors, including Mr. Lopez's character, who he was then, who he has become now, and who I know he hopes to be in the future.

Sent. Tr. 5.

Agreeing, this court imposed the 15-year recommended sentence. Sent. Tr. 8; Judgment 2, ECF No. 1410.

## Compassionate Release Motion

Lopez filed his compassionate release motion in November 2021. ECF No. 2013. After briefing was complete, the parties repeatedly supplemented the record with medical evidence and argument due to Lopez's rapidly evolving medical situation and changing conditions of confinement. *See, e.g.*, ECF No. 2066, 2068, 2069, 2095, 2096, 2103, 2105.

Following a round of supplemental briefing that concluded on December 20, 2022, this court issued an order stating that it required evidence to substantiate certain allegations made in Lopez's most recent supplemental memorandum and set an emergency status hearing due to the very serious representations made by Lopez concerning the lack of medical care he was receiving. *See* Order, Jan. 5, 2023, ECF No. 2098. Despite receiving no assistance from staff at the facility where Lopez is housed (Lopez's counsel's repeated calls for assistance contacting him went unanswered), his lawyer submitted an affidavit from Lopez, with handwritten annotations, on February 1, 2023. ECF No. 2103. The court ordered the government to file any response to the affidavit by February 8, 2023. ECF No. 2104. The government attached two exhibits to its response: (1) an administrative order authorizing Lopez's transfer from FCI-Ashland to FCI-Milan giving the reason for transfer as "Drug Abuse Program" and (2) an administrative detention order signed by Lopez and dated November 19, 2022, stating that Lopez requested a transfer to the special housing unit at FCI-Milan for his own protection. ECF

3

No. 2105 Ex. A, B. This order was approved by authorities at FCI-Milan. ECF No. 2105 Ex. B at 1.

The record contains over 2,000 pages of Lopez's prison medical records, some of which are redundant. The most recent records end in early October 2022, just before Lopez was transferred from FCI-Ashland in Kentucky to FCI-Milan in Michigan. *See* ECF No. 2090. Lopez's affidavit and the administrative detention order dated November 19, 2022, therefore constitute the only evidence the court has before it concerning his care and the conditions at FCI-Milan.

Lopez reported no medical issues other than seasonal allergies when he was sentenced in 2013. PSR 25. He underwent surgery on April 2, 2010, at Advocate Christ Medical Center in Chicago, at which time surgeons implanted surgical mesh to repair a hernia in Lopez's abdomen. *See* ECF No. 2017-1 at 83, 96. Subsequent notes state that the hernia was related to a gunshot wound. *See, e.g.*, ECF No. 2017-1 at 8, 84, 110. Lopez and his doctors have subsequently raised concerns that the surgical mesh implanted in 2010 was defective and possibly the subject of a recall. *See* Mot. Compassionate Release 14–15; ECF No. 2014-1 at 93 (request for 2010 operative reports including notation seeking to identify the particular mesh implanted). As reported by the Food and Drug Administration (FDA), thousands of surgical meshes were recalled between 2005 and 2013. *See* FDA, *Hernia Surgical Mesh Implants*, https://www.fda.gov/medical-devices/implants-and-prosthetics/hernia-surgical-mesh-implants (retrieved Oct. 17, 2021), ECF No. 2013-4. These recalls have sparked the filing of thousands of lawsuits. *See, e.g.*, *In re Atrium Med. Corp. ProLite & ProLoop Hernia Mesh Prod. Liab. Litig.*, 600 F. Supp. 3d 1340 (J.P.M.L. 2022); *In re Covidien Hernia Mesh Prod. Liab. Litig.*, 481 F. Supp. 3d 1348 (J.P.M.L. 2020); *In re Ethicon Physiomesh Flexible Composite Hernia Mesh Prod. Liab. Litig.*, 254 F. Supp. 3d 1381 (J.P.M.L. 2017).

Lopez tested positive for COVID-19 in December 2020; his chief symptom was coughing. ECF No. 2014-1 at 55 (Dec. 2, 2020). Lopez was housed at the federal correctional institution in Ashland, Kentucky ("FCI-Ashland"), at the time. On February 22, 2021, medical

4

records state that Lopez's surgical wound had opened (1 cm.). ECF No. 2014 at 51. A second wound had opened by early March 2022, and drainage from the wound began to be noted. *See id*. at 49. Lopez was referred to an outside medical provider for an X-ray and a surgical consult. *Id*. After several diagnostic appointments, outside doctors noted that a "9.8 x 4.1 x 9cm mass-like area" had developed in Lopez's abdominal wall, requiring surgery for a "[g]eneralized abdominal mass" and an infected hernioplasty mesh." ECF No. 2017-1 at 90–93 (record of King's Daughters Medical Center visit on Aug. 16, 2021). During this period, Lopez, who had no prior history of mental illness, began having anxiety attacks for which he was prescribed anxiety medication he continues to take. ECF No. 2014-1 at 37.

Lopez's condition continued to deteriorate over the next year. *See, e.g.*, ECF No. 2090 at 67. For example, a medical note dated April 6, 2022, states:

> Jorge Lopez is a 49 y.o. male presenting in Consultation with open abdominal wound. . . . Patient states that he has had an open draining wound for over a year. The wound is around a 2 cm width with central deep ulceration. Wound is draining pus and blood and located midline a few inches above the umbilicus along the previous incision site. Patient denies fever or chills, but endorses a headache for which he takes Tylenol twice a day. Patient states that his abdominal pain is "uncomfortable" and limits his mobility.

ECF No. 2090 at 343. Records also show that Lopez was "profusely vomiting" on May 13, 2022; a BOP summary states that the vomiting did not resolve until May 20, 2022. *Id*. at 89, 157. Lopez was taken to the emergency room at King's Daughters Medical Center on May 29, 2022, for treatment for abdominal pain, an abscess, and an infection of his open hernia wound. *See* ECF No. 2090 at 330–38; *see also id.* at 323–24 (follow up appointment at wound care department on July 6, 2022).

Lopez underwent surgery at University of Kentucky HealthCare on July 22, 2022. ECF No. 2091 at 20–22 (operative note). His doctors repaired his hernias, removed "numerous pieces" of infected mesh, re-sectioned and repaired his small bowel, and implanted replacement mesh. *See* ECF No. 2019 at 22 (narrative). Lopez developed serious post-operative complications, including heart conditions such as sinus tachycardia, for which he was transferred to the medical intensive care unit ("MICU"), where he remained for most of the rest of his stay

(15 days). See ECF No. 2091 at 64, 68. He experienced substantial heart problems between July 22–28, 2022, requiring the involvement of cardiologists in his care. See ECF No. 2091 at 64, 72. Lopez's discharge report dated August 11, 2022, lists the following discharge diagnoses:

> Infected hernioplasty mesh (CMS/HCC)
> Gastroesophageal reflux disease
> * (Principal) Infected hernioplasty mesh, sequela
> Infected hernioplasty mesh, initial encounter (CMC/HCC)
> Atrial fibrillation with RVR (CMS/HCC)
> Open wnd anterior abdomen
> . . . .
> Recurrent incisional hernia

ECF No. 2091 at 66.

Post-discharge instructions included packing the wound daily, "follow up with Dr. Roth (surgeon) one month after discharge," and also set a follow-up appointment with a cardiologist in four days. Id. Finally, Lopez was prescribed, among other medicines, a daily dose of dilTIAZem CD, a medication intended to treat his atrial fibrillation. ECF No. 2091 at 65. A notation next to this medication stresses that Lopez should start taking it the next day. See id.

Lopez received wound care and dressing changes beginning August 12, 2022. See ECF No. 2090 at 158–60. A note dated September 9, 2022, describes Lopez's surgical incision wound as healed. Id. at 158.

As Lopez succinctly states in his affidavit, "Though an appointment was scheduled for me before I left the hospital, the staff at FCI Ashland never took me to any follow up medical appointments after I was discharged from the hospital. To the present day, I have not received follow-up medical care for my abdominal surgery or my heart condition." Lopez Aff. ¶ 12, ECF No. 2103. The medical records on file support these averments. It is undisputed that Lopez was not taken to any follow-up appointments recommended by his surgeons.

In October 2022, BOP officials administratively transferred Lopez over 300 miles away from his surgeon to "FCI-Milan" in Milan, Michigan. ECF No. 2096 at 12; Lopez Aff. ¶ 13.

The transfer had the stated purpose of allowing Lopez to participate in a residential drug treatment program recommended by the court at sentencing. *See* ECF No. 2105 Ex. A at 1. Shortly after arriving at FCI-Milan, Lopez received what he interpreted as a threat from other prisoners due to his status as a cooperator. *See* Lopez Aff. ¶ 13. Lopez requested a transfer to FCI-Milan's special housing unit ("SHU") for his safety, which request BOP staff approved. *See* ECF No. 2105 Ex. B at 1. BOP personnel are required to investigate and verify a threat to an inmate's safety before such a transfer. *See* 28 C.F.R. § 541.28(a). Lopez has been given no specific timeline for his return to the general prison population. *See* Lopez Aff. ¶ 13. Regarding the restrictions placed on him at FCI-Milan, Lopez avers:

> 14. My cell in the SHU is very small and is only 6 feet by 8 feet. Unlike prisoners in general population, I am only allowed to shower 3 [times]-per week. I am only allowed to place 2 call[s] per month. I am not allowed to exercise, engage in programming, Fridays only visit the commissary 6 items or use a computer to communicate with my family on CORR Links. I am not allowed to attend classes, including the RDAP the Court recommended me for. My meals are delivered to my cell and 2 [times] a month, a phone is brought to my cell to allow me to make a brief call to my family.
>
> 15. During the first 7 days at FCI Milan, my heart medications were denied. Along with the isolation of being in the hole, this caused me great distress, as doctors warned me that I must take this medication for my heart. My anxiety is even greater because I cannot exercise like my heart doctors ordered me to do when I was released from the hospital. My doctors told me to move around to prevent my legs from swelling [and] keep them up after walking. I am not able to exercise or move around inside a small cell.
>
> 16. I am still weak and I have not been able to regain the weight or rebuild the strength or muscle mass I lost when I was so sick. I am worried about my ability to protect and care for myself and my health while in the BOP, especially because I cannot exercise or access healthy food. I am also very worried that if I get COVID again, I might have very serious complications because my heart condition puts me at a high risk for serious complications from COVID, including death.

Lopez Aff. ¶¶ 14–16.

## Analysis

Upon motion by a prisoner who has exhausted administrative remedies,[2] the compassionate release statute authorizes a sentence reduction "after considering the [sentencing]

---

2   The government conceded that Lopez has exhausted his administrative remedies in its response to Lopez's motion for compassionate release, ECF No. 2021 at 12, thereby waiving this affirmative
    (continued on next page)

factors set forth in section 3553(a) to the extent that they are applicable" for "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A)(i). Any such sentence reduction must also be "consistent with applicable policy statements issued by the sentencing commission." *Id*. § 3582(c)(1)(A). Under Seventh Circuit law, analysis of a compassionate release motion proceeds in two steps. *See United States v. Peoples*, 41 F.4th 837, 840 (7th Cir. 2022); *United States v. Sarno*, 37 F.4th 1249, 1252–53 (7th Cir. 2022). At step one, Lopez must identify "an 'extraordinary and compelling' reason warranting a sentence reduction." *Peoples*, 41 F.4th at 840 (quoting *United States v. Thacker*, 4 F.4th 569, 576 (7th Cir. 2021)). If the defendant identifies such a reason, the court proceeds to the second step and "exercis[es] the discretion conferred by the compassionate release statute, to consider any applicable sentencing factors in § 3553(a) as part of determining what sentencing reduction to award the prisoner." *Id.* (alteration in original) (quoting *Thacker*, 4 F.4th at 576).

### *Extraordinary and Compelling Reasons*

Lopez identifies two extraordinary and compelling reasons in his motion and supplemental briefing. First, he cites a Centers for Disease Control (CDC) web page to argue that his heart conditions put him at high risk of severe COVID-19. ECF No. 2096 at 13–14. Lopez cites cases granting compassionate release based on health risks to prisoners before COVID vaccines became widely available. *See, e.g.*, *United States v. Sparkman*, 2020 WL 6781793 (N.D. Ill. Nov. 18, 2020). The cases Lopez cites predate *United States v. Broadfield*, which holds that "for the vast majority of prisoners, the availability of a vaccine makes it

---

defense. *See United States v. Gunn*, 980 F.3d 1178, 1179 (7th Cir. 2020). In a supplemental response, the government argues that Lopez has waived any argument that his post-sentencing rehabilitation is an extraordinary and compelling reason at step one of the compassionate release analysis. *See* ECF No. 2095 at 4. The government alternatively contends that Rule 35 of the Federal Rules of Criminal Procedure is the exclusive vehicle for seeking a sentence reduction based on post-sentencing assistance to the government. *See id*. These perfunctory arguments have not been adequately developed; the government cites no authority. *See id*. Regardless, the court does not reach these arguments because Lopez has demonstrated that an extraordinary and compelling reason exists separate from any alleged post-sentencing assistance he rendered to the government. The court also does not rely on Lopez's alleged post-sentencing assistance at the second step of the § 3582(c)(1)(A)(i) analysis because the record contains insufficient information on the existence and extent of Lopez's alleged post-sentencing assistance.

8

impossible to conclude that the risk of COVID-19 is an 'extraordinary and compelling' reason for immediate release." 5 F.4th 801, 803 (7th Cir. 2021). But *Broadfield* "included a safety valve for prisoners to show that they are unable to receive or benefit from a vaccine, or that they remain vulnerable to severe infection, notwithstanding the vaccine." *United States v. Newton*, 37 F.4th 1207, 1209 (7th Cir. 2022) (quoting *United States v. Rucker*, 27 F.4th 560, 563 (7th Cir. 2022)). A prisoner seeking to invoke the *Broadfield* safety valve must present "individualized facts based on concerns like Omicron breakthrough cases, long COVID, or the relative inefficacy of vaccines for certain vulnerable prison populations, like the immunocompromised." *Id.* (citations omitted).

Lopez has not provided sufficient individualized evidence to invoke the *Broadfield* safety valve. He tested positive for COVID-19 in 2020 and was subsequently vaccinated. *See* ECF No. 2014-1 at 56, 75. The CDC website he cites states, "Having heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and possibly high blood pressure (hypertension) can make you more likely to get very sick from COVID-19." CDC, *Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-withmedical-conditions.html (updated Jan. 26, 2023; visited Feb. 7, 2023). Lopez's particular heart conditions are not listed, and the cited website says nothing about the risks to a vaccinated person such as Lopez. *See id*.; *see also Newton*, 37 F.4th at 1209–10 (affirming denial of compassionate release motion based on CDC report and prisoner's immunocompromised status because the report had "nothing to do with [the defendant] individually").

Lopez's second reason for compassionate release is grounded on § 1B1.13 of the United States Sentencing Guidelines, which contains policy statements promulgated by the U.S. Sentencing Commission concerning what constitute extraordinary and compelling reasons for compassionate release. The present version[3] of § 1B1.13 applies by its terms to compassionate release motions filed by the BOP, so it is not an "applicable policy statement[ ] issued by the

---

3   The Sentencing Commission recently circulated for notice and comment a series of proposed changes to § 1B1.13. Notice, 88 Fed. Reg. 7180 (Feb. 2, 2023).

9

Sentencing Commission" under § 3582(c)(1)(A) and is not binding. *United States v. Gunn*, 980 F.3d 1178, 1179–80 (7th Cir. 2020). Despite its non-binding status, The Seventh Circuit has stated that § 1B1.13 remains "useful to guide district judges' discretion" when analyzing compassionate release motions. *United States v. King*, 40 F.4th 594, 595 (7th Cir. 2022) (citing *Gunn*, 980 F.3d at 1180); *see also Rucker*, 27 F.4th at 562. Lopez relies on one of the § 1B1.13 criteria, arguing that he is suffering from a condition "that substantially diminishes [his] ability . . . to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover." U.S.S.G. § 1B1.13 cmt. n.1(A)(ii).

  The government does not dispute that Lopez's medical conditions are serious or likely permanent. *See* 2d Suppl. Resp. at 2–3, ECF No. 2095; Resp. to Mot. Compassionate Release 13–18, ECF No. 2021. Indeed, Lopez spent two weeks in the medical intensive care unit before his heart conditions—atrial fibrillation and tachycardia—were managed. *See* ECF No. 2091 at 306 (discharged from MICU to hospital medicine service on Aug. 5, 2022). The government instead maintains that BOP personnel are adequately addressing Lopez's medical needs, as in cases such as *United States v. Kline*, 2022 WL 17337795, at *1 (S.D. Ill. Nov. 30, 2022), and *United States v. Tinker*, 2022 WL 124526, at *2 (S.D. Ill. Jan. 13, 2022). *See* 2d Suppl. Resp. at 1–3.

  In support of its position the government observes that Lopez does not explicitly state in his affidavit that the medical care he is receiving is insufficient. *See* Gov't Suppl. Mem. at 2, Feb. 8, 2022, ECF No. 2105. But Lopez's medical records demonstrate clearly that BOP personnel have not scheduled any of the follow-up care Lopez's surgeons recommended when he was discharged on August 11, 2022. No reason for failing to follow this advice has been given, and the government does not indicate that any plans exist to arrange for the care Lopez needs. *See* ECF No. 2105; ECF No. 2095 at 2–3 (acknowledging that Lopez had "follow-up appointments scheduled with the hospital's surgery staff and cardiology staff). The government argues that Lopez is recovering well, citing no evidence. *See* ECF No. 2095 at 3. The only evidence tending to support this assertion is a BOP note stating that Lopez's surgical wound has

10

closed. ECF No. 2090 at 158. Lopez's averment that he is still weak and unable to follow his doctor's instructions for physical exercise stands uncontradicted, however. Lopez Aff. ¶¶ 11, 16. To the extent that the government is arguing that a surgical follow-up appointment is unnecessary, no evidence has been cited showing that the sole purpose of the follow-up appointment was to monitor the surgical wound's closure. *See id*. The government has not filed any medical records from FCI-Milan after multiple opportunities to do so. Given the length and seriousness of Lopez's post-operative complications, the court concludes that the surgeon's discharge orders cannot be ignored without serious ongoing risks to Lopez's health.[4]

Instead of taking Lopez for the follow-up care his doctors recommended when he was discharged from surgery, the BOP transferred Lopez from a facility near his surgeon to FCI-Milan in Michigan, where he has been in solitary confinement (referred to as the "Special Housing Unit" or "SHU") for his protection. *See* Lopez Aff. ¶¶ 13; ECF No. 2105 Ex. B (administrative transfer order dated Nov. 19, 2022). The only reason the court has been given for the transfer is that it may have been intended to facilitate Lopez's participation in a residential drug reentry program. *See* ECF No. 2105 at 1; ECF No. 2105 Ex. A at 1. If that was the purpose, it has failed because, while in solitary confinement with no fixed end date, Lopez is not allowed to participate in the drug reentry program or any other classes at FCI-Milan. Lopez Aff. ¶ 14. Nor can Lopez exercise as his surgeons instructed him to do to mitigate the risks of future complications of his heart disease. *See* Lopez Aff. ¶¶ 15, 16.

The government points out that Lopez requested to be placed in solitary confinement. But this is not a matter entirely in the control of Lopez. BOP regulations plainly state, "Whenever you are placed in the SHU as a protection case, whether requested by you or staff, an investigation will occur to verify the reasons for your placement." 28 C.F.R. § 541.28(a). Unless this regulation was not followed (the court knows of no reason to think it was not), BOP

---

4  BOP staff also failed to dispense Lopez's prescribed heart medication for a week. Lopez Aff. ¶ 15; ECF No. 2105 at 2. Again, no explanation has been provided, and the government offers no assurances that this was a one-time lapse. *See* ECF No. 2105 at 2.

personnel have independently verified the threat to Lopez's safety at FCI-Milan. Cf. 28 C.F.R. § 541.26 (requiring ongoing reviews of SHU placements). The government also suggests that the proper remedy is a transfer to another facility with a drug treatment program and notes that Lopez has not requested such a transfer. ECF No. 2105 at 2–3. The government does not identify any BOP facility with a drug treatment program to which Lopez could be transferred and housed in the general population, however. *See id*. Moreover, a prisoner request is not required to accomplish such a transfer. BOP regulations provide, "If a staff investigation verifies your need for placement in the SHU as a protection case, you may remain in the SHU or be transferred to another institution where your status as a protection case may not be necessary, at the Warden's discretion." 28 C.F.R. § 541.29. Yet the government does not represent that the BOP has any intention of transferring Lopez to another facility now or in the future.

For all of these reasons, Lopez's transfer to FCI-Milan defeated its stated penological purpose and placed Lopez in a solitary confinement situation (for non-punitive purposes) in which his ability to care for his medical needs has been frustrated and his conditions of confinement have become far more burdensome. Lopez has no way to arrange for surgical follow-up or to schedule an appointment with a cardiologist, and no realistic option has been suggested by which he could get the medical care and exercise his doctors say he needs.[5] As the Supreme Court has recognized, "An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Estelle v. Gamble*, 429 U.S.

---

5  In a supplemental filing, Lopez argues that the BOP's delays in treating his medical condition (February 2021–July 2022) and arranging surgery constitute an extraordinary and compelling reason for a sentence reduction. ECF No. 2096 at 14–15; *see also id*. at 3–11. Section 1B1.13 focuses on the defendant's present ability to care for himself in prison and his present medical condition. *See* U.S.S.G § 1B1.13 cmt. n.1(B). Accordingly, courts have found extraordinary and compelling reasons where a history of inadequate and delayed medical care demonstrates that the defendant "is unlikely to receive better treatment [from the BOP] going forward." *United States v. Beck*, 425 F. Supp. 3d 573, 580–81 (M.D.N.C. 2019); *United States v. Roman*, 2021 WL 3173351, at *4 (S.D. Ohio July 26, 2021), *aff'd on other grounds by unpublished order*, 2022 WL 363866 (6th Cir. Jan. 7, 2022). Similarly here, the BOP's unexplained delay of at least a year in arranging for Lopez's surgery coupled with its continued failure to arrange for the post-operative care ordered by his doctors in the ensuing six months (August 2022–present) demonstrate that Lopez is unlikely to receive better treatment if he remains in BOP custody.

97, 103 (1976). Accordingly, Lopez has carried his burden to demonstrate that an extraordinary and compelling reason exists in accordance with the nonbinding guidance of § 1B1.13 of the sentencing guidelines.

### *Sentencing Factors*

"Rehabilitation 'cannot serve as a stand-alone reason' for compassionate release." *Peoples*, *supra*, 41 F.4th at 842 (citation omitted); *accord* 28 U.S.C. § 994(t). But rehabilitation may be combined with other factors: "successful rehabilitation efforts may . . . be considered as one among other factors." *Peoples*, 41 F.4th at 842 (quoting *United States v. McCoy*, 981 F.3d 271, 286 n.9 (4th Cir. 2020); other citation omitted). Within the confines of these rules, courts have "broad discretion" when weighing the statutory sentencing factors, 18 U.S.C. § 3553(a), at the second step of the compassionate release analysis. *Rucker*, *supra*, 27 F.4th at 563 (citing *United States v. Saunders*, 986 F.3d 1076, 1078 (7th Cir. 2021)).

The government argues that, notwithstanding his cooperation, Lopez's crimes were serious, involving solicitation of a murder, kidnapping, and trafficking in distribution amounts of cocaine. *See* Plea Agmt. 2–17 (admitted offense conduct). Based on this conduct, continues the government, the nature and seriousness of Lopez's crime, the need to promote respect for the law, the interest in providing just punishment, and deterrence interests counsel against a sentence reduction. *See* Resp. to Mot. Compassionate Release 19. The court agrees, as it did at sentencing, that Lopez's crimes were serious and deserving of a long sentence. *See* Sent. Tr. 7–8. Lopez has served nearly ten years in prison, which amounts to over 80% of his expected sentence. That is a long sentence by any measure, and it is even longer (nearly 14 years) if Lopez's four years on pretrial home detention is included, as the court recommended at sentencing.

Also, additional mitigating information has come to the court's attention since Lopez's sentencing hearing. As the court has repeatedly stated in re-sentencing and compassionate release proceedings involving Lopez's co-defendants:

13

> [T]he impact of Saul Rodriguez on Hector Uriarte and on the other defendants was not adequately appreciated by most of us at the time of the original sentencing. . . .
>
> Mr. Rodriguez is probably the most effective con man I have ever seen in my capacity as a judge. He conned the government, telling all kinds of lies to the grand jury, as I understand it; getting a telephone smuggled into him in the MCC, so he could communicate with potential witnesses, including arranging hits on potential witnesses. This is when he is in the MCC cooperating with the government.
>
> . . . .
>
> If Mr. Rodriguez could so effectively con the government, is it any surprise that he conned his co-defendants . . . ?

*Sparkman, supra*, 2020 WL 6781793, at *9 (quoting H. Uriarte Re-Sent. Tr. 43, ECF No. 1844).

Lopez's background made him just as vulnerable to Rodriguez's manipulations as his co-defendants. He grew up in two neighborhoods on Chicago's south side that he described as "rife with gang activity and violence." PSR 23. He began associating with members of the Satan Disciples street gang at age five, and he became a gang member "by default." *Id.* He did not complete high school. *See id.* at 27.

But Lopez's 2009 arrest in this case marked a sea change in the trajectory of his life. His extensive cooperation and the government's request for a downward departure from a recommended life sentence to a 15-year sentence attests to this fact. Indeed, while on pretrial release, Lopez spoke to at least two young people with similar backgrounds in an effort to persuade them not to follow in his footsteps and instead avoid the gang lifestyle. *See* Sent. Tr. 6 (representations of Lopez's attorney). Lopez fully complied with all terms of his pretrial release, which the probation officer who wrote his sentencing recommendation described as the "functional equivalent of supervised release." Sent. Recommendation 4, ECF No. 1383. By the time of sentencing in 2013 it was clear to the court and the lawyers for both sides that Lopez no longer represented a threat to the public and that he was well on the way to rehabilitation. As the court stated at Lopez's 2013 sentencing hearing:

> I just will point out that I think given where Mr. Lopez came from and the difficulties of his early life, the environment in which he grew up, the things that he did in his early life, while certainly not admirable, they are easy to understand.

14

> . . . .
>
> I think that when you come from a place like the place where you've come to, you know, what can you do to fix things? I think you've probably done as much as any human being can do to fix things. And I think everybody is grateful, and certainly the Court is grateful, and the justice system is grateful, and the people in this district if they knew about it, they should be grateful.

Sent. Tr. 7.

Lopez's post-sentencing conduct confirms that he no longer represents a danger to society and that he has been substantially rehabilitated. *See* U.S.S.G. § 1B1.13(b)(2). Upon intake, the BOP described him as a "LOW SECURITY INMATE." ECF 2014-2 at 98 (Security/Designation Data dated Oct. 11, 2013). During ten years of incarceration, Lopez has acquired no prison disciplinary history. ECF 2014-2 at 7, *see also* Lopez Aff. ¶ 2. Indeed, a 2018 BOP progress report on Lopez states, "Inmate Lopez has not been a management problem. He has remained incident free." ECF No. 2014-2 at 12 (Summary Reentry Plan – Progress Report dated Sept. 19, 2018). A January 2021 male pattern risk report states that Lopez's risk of recidivism is "minimum." *See* ECF No. 2014-2 at 49; *see also id.* at 99 (July 2020 male pattern risk report stating same).

From roughly the time he arrived at FCI-Ashland in 2013, Lopez was entrusted with a prison job, first in food service and later as an orderly until at least August 2021. *See* ECF No. 2014-2 at 6, 50, 52. His supervisors consistently gave him satisfactory evaluations. *See, e.g.*, ECF No. 2014-2 at 11, 52, 70–71. Lopez had to be relieved of his duties as an orderly because his deteriorating medical condition left him unable to lift the required weight. *See* Lopez Aff. ¶ 6. Even so, he continued to work sweeping stairs. *Id*. Thus, Lopez has demonstrated a strong work ethic, which bodes well for his employment prospects.

Lopez had "marketable vocational skills" at the time of his initial incarceration. Sent. Recommendation 3. Lopez held jobs as a laborer before his arrest. *See* PSR 27–28. He also worked at a waterproofing company as a union worker hanging drywall. PSR 27. In prison, Lopez has gained additional marketable skills. For instance, in 2019, he enrolled in a housekeeping aide apprenticeship program intended to equip him with marketable skills upon

15

release. *See* ECF 2014-2 at 72, 75. And he has taken a sales skills course, a "prison to paycheck" course, and a course labeled "commercial driver's license." *Id*. at 72.

Importantly for his job prospects, Lopez earned his general education degree in 2015 while incarcerated. ECF No. 2014-2 at 4. After that, he continued to take courses on a wide variety of practical subjects, such as computer skills and keyboarding, parenting, anger management, changing criminal thinking, and health and wellness. He appears to have a special interest in history, for he has taken history courses on subjects ranging from the history of the Civil War to the history of jazz. *See id*. Lopez has "engaged in hundreds of hours of programming and work assignments" during his incarceration. *See* Lopez Aff. ¶ 2. Notes in his records at FCI-Ashland indicate that he was on the waiting list for even more prison courses, including anger management and "Money Smart" courses. *See id*. at 52 (Individualized Needs Plan – Program Review dated June 23, 2021). Thus, Lopez has taken full advantage of his prison time to rehabilitate himself and equip himself with marketable job skills and practical skills to prepare himself to contribute to society upon his release. But Lopez cannot participate in any BOP programming, at this time or in the foreseeable future, including the court-recommended residential drug treatment program,[6] while he is in solitary confinement at FCI-Milan, thus frustrating his ability further to prepare himself to re-enter society and the job market. *See* Lopez Aff. ¶ 14.

Finally, Lopez has a strong release plan. *See* ECF No. 2014-3. ███████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

---

6   Lopez completed a non-residential drug treatment program, a prerequisite for entering a residential drug treatment program, while he was at FCI-Ashland. ECF No. 2014-2 at 79 (Individualized Reentry Plan – Program Review dated Jan. 29, 2020).

██████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█

      Considering all of the foregoing in its totality in light of the sentencing factors set out in 18 U.S.C. § 3553, Lopez's continued incarceration cannot be justified. Lopez has served over 80% of his expected sentence. He in fact would have been released had the court's (unopposed) recommendation that he receive credit for his four years of pre-sentencing home detention been credited. Sent. Tr. 11. He has substantially rehabilitated himself. The BOP agrees that he is a low security risk and a low recidivism risk. He has no prospects of obtaining court-recommended residential drug treatment or to participate in any other programs intended to facilitate his reentry into society while he is in the SHU at FCI-Milan, where he has been placed indefinitely for his protection. And so long as he is housed in these conditions, Lopez has no way to meet his serious medical needs and obtain the post-operative treatment ordered by his surgeons six months ago. For all of these reasons and those stated above, Lopez's motion for compassionate release is granted, and his sentence is reduced to the time he has served. Because Lopez will not receive the residential drug treatment recommended by this court, Lopez's probation officer is directed to evaluate Lopez's options for receiving similar support once his term of supervision has commenced and to propose any appropriate modifications to Lopez's supervision conditions within 28 days.

Dated: February 13, 2023                                             /s/
                                                                                       Joan B. Gottschall
                                                                                       United States District Judge